# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA ： 
： CRIMINAL ACTION
v. 
**FILED** NO. 07-667

JERMAINE RANDLE JUL 2 4 2009

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

July 24, 2009 **Anita B. Brody, J.**

## MEMORANDUM

Jermaine Randle was arrested and charged under 21 U.S.C. § 841(a)(1) and (b)(1)(B)

with possessing a controlled substance after his parole officer found cocaine in his bedroom. The

officer searched the bedroom without a warrant two weeks after Randle's urine tested positive

for cocaine. Asserting a Fourth Amendment violation, Randle now moves to suppress the

cocaine and other items seized. I conducted a hearing on February 17, 2009, and make factual

findings below. Here, the issue is whether a parolee testing positive for a controlled substance

creates a reasonable suspicion that justifies a search under the Fourth Amendment. I find that it

does and will deny the motion to suppress.

## I. BACKGROUND

A Pennsylvania court sentenced Randle to 6 to 12 years imprisonment for involuntary

manslaughter and carrying a firearm in public. He was paroled in January 2006. Conditions of

his parole required Randle not to associate with gang members, to undergo urinalysis testing, and

1

to receive treatment for anger management and drug and alcohol abuse. (Gov.'s Ex. 1.) He also had to work with his parole officer Frontis Cue. (Supp'n Hr'g Tr. 21-22, Feb. 17, 2009.)

Randle lived at his mother's house after being released. His mother signed a waiver that stated: "I understand that Parole Supervision Staff has a right to search the residence at anytime when reasonable suspicion exists that parole has been violated." (Gov.'s Ex. 3.) For six months, Randle went to an outpatient drug treatment facility twice a week. (Hr'g Tr. 79.)

Randle and Cue had a meeting scheduled for October 3, 2006. When Randle arrived for this meeting, another officer gave Randle a urine test. (Hr'g Tr. 22-23, 48.) Two days later, the urinalysis result came back positive for cocaine. Specifically, the urinalysis showed 203 nanograms of cocaine metabolites (byproducts of cocaine metabolizing in the body) per milliliter of urine ("ng/mL"). This was just over the threshold amount of 150 ng/mL used to screen for cocaine use. (Gov.'s Ex. 4.)

Based on the positive urinalysis, Cue concluded that Randle violated a parole condition.[1] (Hr'g Tr. 27.) Their next meeting was scheduled for October 17, 2006. (Hr'g Tr. 29, 78.) Cue planned to detain Randle when he arrived for that meeting and then to search his mother's house for evidence of more violations. (Hr'g Tr. 67.)

On October 17, 2006, Randle drove his mother's van to the parole office. He passed through a metal detector, and Cue took him back to Cue's office.[2] After they exchanged

---

[1] Cue testified that a result of 203 ng/mL (much lower than when someone has just relapsed) meant that Randle was handling cocaine. (Hr'g Tr. 27-28.) Cue later admitted that it could also mean that Randle used cocaine about five days before being tested. (Hr'g Tr. 73-74.)

[2] Cue testified that his encounter with Randle occurred differently. According to him, Cue asked Randle at the metal detector where his keys were, Randle responded that he had walked, Cue

2

greetings, Cue spoke into his walkie-talkie, officers entered the room, Cue had Randle stand up and turn around, and Cue handcuffed him.  Cue asked Randle if anyone was at his mother's house, and Randle answered "no."  After calling the house to confirm, Cue placed Randle in a holding cell.  About 30 minutes later, Cue returned for keys to the van.  Randle told him where they were inside the van.  (Hr'g Tr. 79-80.)

Cue and other officers searched the van without a warrant.  Underneath a seat they found a small club-like weapon called a "slapjack."[3]  (Hr'g Tr. 34, 65.)  Cue asked Randle about it, and Randle said that it was his mother's.  (Hr'g Tr. 35.)  Cue and other officers then went to her house without obtaining a warrant.  Cue called inside with no answer.  Then they entered and went directly to Randle's bedroom.  There Cue found a mask, a metal chain, brass knuckles, and several alligators inside a terrarium.  He also found plastic baggies containing cocaine.  (Gov.'s Ex. 5; Hr'g Tr. 37.)  At this point, Cue called the police for assistance.

Police officers came to the house and seized the weapons and cocaine.  Randle was arrested that afternoon.  He was later indicted on one count of possessing with intent to distribute five or more grams of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B).  Randle now moves to suppress the slapjack and everything seized from his bedroom.

---

cajoled him by saying "this is me you're talking to," and then Randle confessed to lying.  (Hr'g Tr. 32.)

[3] Cue testified that possessing a slapjack was a parole violation for Randle (Hr'g Tr. 34), but the parole conditions do not prohibit Randle from possessing weapons other than ammunition, bullet casings, cartridges, gunpowder, and explosive devices (Gov.'s Ex 2).

## II. DISCUSSION

Randle asserts that the searches violated his Fourth Amendment guarantee against "unreasonable searches and seizures." U.S. Const. amend. IV.  Interpreting the word "unreasonable," the Third Circuit has concluded that "a parolee's car or home can be searched on the basis of reasonable suspicion alone." U.S. v. Baker, 221 F.3d 438, 443-44 (3d Cir. 2000). The Supreme Court defined "reasonable suspicion" in Terry v. Ohio, 392 U.S. 1 (1968), stating that it requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21.  The Court explained that "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" Id. at 21-22 (internal quotation marks omitted). Later in U.S. v. Arvizu, 534 U.S. 266 (2002), the Court explained that courts determining reasonable suspicion "must look at the totality of the circumstances of each case to see whether the … officer has a particularized and objective basis for suspecting legal wrongdoing." Id. at 273 (internal quotation marks omitted).

The government alleges various facts supporting a reasonable suspicion.  Apart from the positive urinalysis, however, I find these allegations not credible.  Therefore, the issue becomes whether a positive urinalysis alone creates a reasonable suspicion that justifies searching a parolee's car or residence.  I will find that it does.


### A.  Witness Credibility

The government alleges that Cue had a reasonable suspicion because Randle tested

4

positive for cocaine, had been involved with drug distribution, and lied to Cue during the

October 17 meeting.[4]  (Gov.'s Resp. 7.)  Randle admits testing positive for cocaine but denies the

other allegations.  Cue testified about these allegations during the hearing on February 17, 2009,

but I found him not credible.  He could not remember critical events, contradicted himself on

major issues, and often hedged or dissimulated to escape hard questions.

First, Cue could not remember when Randle was paroled.  (Hr'g Tr. 11.)  His immediate

inability to remember something so basic prompted the following bench conference with the

Assistant U.S. Attorney Joseph Lisa:

| | |
|---|---|
| THE COURT: | Mr. Lisa — |
| MR. LISA: | Yes, Your Honor. |
| THE COURT: | — have you reviewed this with this witness? |
| MR. LISA: | Yes, I have, Your Honor. |
| THE COURT: | You have? |
| MR. LISA: | Yes, Your Honor, on two occasions. |
| THE COURT: | What?  Okay. |

(Hr'g Tr. 11.)  Despite having supervised Randle for eight months, Cue also could not remember

the crime for which Randle was paroled.  (Hr'g Tr. 12.)

Next, Cue flatly contradicted himself regarding the October 3, 2006, meeting.  He first

testified that he himself gave Randle a urine test, but later, Cue testified that another officer gave

the test.  (Hr'g Tr. 22-23, 48.)  Cue even noted why his story changed, namely, because Cue

spotted the other officer's name on the urinalysis report.  (Hr'g Tr. 48-49.)  A more candid

witness would have admitted from the beginning that he could not recall who gave the test.

---

[4] The government also cites the slapjack Cue found, but making this discovery a basis for reasonable suspicion puts the cart before the horse.  I am assessing whether the search leading to this discovery was lawful.

Cue's testimony about getting the urinalysis result on October 5, 2006, also had holes. Under the heading "Testimony of State Parole Agent Frontis Cue," the government's brief alleged that upon receiving the urinalysis report Cue immediately contacted Randle to schedule the October 17 meeting. (Gov.'s Resp. 3.) But Cue said the opposite when he testified. (Hr'g Tr. 29-31, 51.) When asked where Lisa got his information, Cue speculated that Lisa might have gotten it from him and then chafed: "I don't remember every conversation and everything that went over." (Hr'g Tr. 51-52.)

Next, Cue showed a dishonest bias when he testified about the urinalysis result. Initially, Cue testified that a metabolite level of 203 ng/mL meant that Randle was handling cocaine.[5]

---

[5] This opinion testimony seems inadmissible under Federal Rule of Evidence 701 because Cue was not certified as an expert witness under Rule 702, but Randle never objected. Rule 701 prohibits a lay witness from offering "opinions or inferences ... based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). In other words, lay testimony must "result[] from a process of reasoning familiar in everyday life" and not "from a process of reasoning which can be mastered only by specialists in the field." Fed. R. Evid. 701 advisory committee's note (internal quotation marks omitted). "Testimony based solely on a person's special training or experience is properly classified as expert testimony, and therefore it is not admissible under Rule 701." Compania Administradora v. Titan Intern'l, Inc., 533 F.3d 555, 561 (7th Cir. 2008). This includes testimony about an opinion reached during a parole officer's investigation. See U.S. v. Garcia, 413 F.3d 201, 216 (2d Cir. 2005) (holding that a law enforcement agent may not testify about an opinion reached during his investigation "if the agent's reasoning process depended, in whole or in part, on his specialized training and experience"). Cue's testimony here does not "result[] from a process of reasoning familiar in everyday life" but instead requires special expertise on how the human body receives and metabolizes cocaine. Fed. R. Evid. 701 advisory committee's note (internal quotation marks omitted). Cue also testified that his opinion was based on his special experience as a parole officer. (Hr'g Tr. 27-28.) His testimony thus seems inadmissible. See Hirst v. Inverness Hotel Corp., 544 F.3d 221, 227 (3d Cir. 2008) (holding that a lay witness could not offer opinion testimony that required technical or specialized knowledge of what security measures could or should have been taken to prevent a crime); Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 669 (10th Cir. 2006) (holding that a lay witness could not opine about whether something constituted a compelling state interest because it required legal expertise). Regardless, I allowed the testimony because Randle never objected.

(Hr'g Tr. 27.)  But when asked whether it could also mean that Randle ingested cocaine around five days before being tested, Cue testified as follows:

> A:   He could have ingested it, but in this situation, he didn't.
> Q:   And how do you know that?
> A:   Because we went to his house and found the narcotics.
> Q:   Oh, but you didn't know that at the time?
> A:   No.

(Hr'g Tr. 73-74.)  This suggests that Cue's testimony about his suspicion of Randle handling cocaine was biased by what Cue later found during his search.  He never explained why the urinalysis result implied to him handling instead of ingestion of cocaine that almost fully metabolized before the test.  The most plausible explanation is that handling best conformed to his discovery of packaged cocaine in Randle's bedroom.

Cue also exhibited a faulty memory regarding the crucial October 17, 2006, meeting.  To begin with, Cue could not remember the date of this meeting, even though this was when his controversial search occurred.  (Hr'g Tr. 29.)  Furthermore, the government's brief alleged that at the October 17 meeting Randle pulled keys from his pocket (Gov.'s Resp. 3), but Cue testified that Randle was not carrying keys (Hr'g Tr. 32-34, 53).  When confronted with this, Cue vacillated for a moment and concluded: "I really don't remember if they was in the pocket or in the vehicle." (Hr'g Tr. 53-54.)

Next, Cue's most problematic testimony concerned Randle's criminal history.  The government's brief alleged that, at some point, Cue learned of Randle being an "enforcer" for a drug organization.  (Gov.'s Resp. 10.)  Over the course of cross-examination, Cue came up with three separate stories to justify this allegation.  Far from an honest recollection, this testimony was like a hunt for the best excuse.  First, Cue stated that Randle had confessed to him being an

7

enforcer. (Hr'g Tr. 60.)  Second, Cue stated that, actually, his suspicion of Randle's connection to illegal drugs came from Randle having a parole condition that barred him from associating with co-defendants or gang members.[6]  (Hr'g Tr. 60-63.)  Third, correcting himself again, Cue said that he learned of Randle being an enforcer by reading about his offense, which Cue said involved "a fight on the corner between two people ... arguing over drugs or something." (Hr'g Tr. 63.)

Flustered, Cue finally recanted his first and third explanations: "The only thing I did was, I read the file, I read the release orders and I formed my position on how I was going to handle Mr. Randle." (Hr'g Tr. 64.)  Cue then spilled the true reason for the government's allegation: "So when — when you — when you say enforcer, then I gotta go back to the things that I found in that bedroom, brass knuckles, an —" (Hr'g Tr. 64.)  Revealing the same dishonest bias mentioned before, this testimony indicates that the weapons discovered in Randle's bedroom are what inspired the allegation that Randle had been an enforcer.

Cue's testimony on this topic ended with a blatant contradiction.  As mentioned, he initially testified that Randle had confessed to him being an enforcer for a drug organization. The testimony was as follows:

> Q:    Now, what — what about his file or what in his file led you to believe that he [Randle] had been involved in drug use for — or sales?
> A:    As I said before, we communicated.  I've been working them streets for a while, and I knew some of the history that was not in the file and — relating back to his original charge where he was the muscle man for a

---

[6] The parole condition states: "YOU SHALL NOT DIRECTLY OR INDIRECTLY HAVE CONTACT OR ASSOCIATE WITH THE CO-DEFENDANT(S), GANG MEMBERS FOR ANY REASON." (Gov.'s Ex. 1.)  Cue misquoted the condition as stating: "You are not directed to have any contact with any gang or drug affiliation members." (Hr'g Tr. 62-63.)

> drug corner, and we had this conversation, me and him.
>
> Q:     So you had a conversation with Mr. Randle where you — you believe you
>        discovered that he was a muscle man for a drug dealer, is that correct?
>
> A:     Yes, sir.

(Hr'g Tr. 60.)  Minutes later, Cue made a complete U-turn.  When asked again whether he

believed that Randle had been an enforcer, Cue hedged and finally testified as follows:

> Q:     … And so you never had a conversation with Mr. Randle where he told
>        you he was the muscle man for a drug organization?
>
> A:     No, he wouldn't tell me that.

(Hr'g Tr. 65.)

Finally, Cue contradicted himself on the central issue—the reason why he conducted the

search.  Cue initially testified that Randle was detained because he lied about driving to the

meeting, and that Cue decided to search the house only after finding a weapon in the van.  (Hr'g

Tr. 32-35.)  But later, Cue testified as follows:

> Q:     … So you didn't already have in your mind when Mr. Randle came to your
>        office on the 17th that you were going to detain him and search his home?
>
> A:     For that hot urine, yes, I did.
>
> Q:     So you — just the hot urine alone was what — your plan was essentially
>        — when he comes in, we're going to detain him and then we're going to
>        search his house, is that right?
>
> A:     That's correct.

(Hr'g Tr. 67.)  Cue thus contradicted himself regarding his reason for the search.  In context, his

testimony shows that Cue wanted to invent more justification for his search than actually existed

on October 17, 2006.

For the reasons stated above, I find that Cue's testimony was not credible on all matters.

See Lambert v. Blackwell, 387 F.3d 210, 256 (3d Cir. 2004) (approving "the common jury

instruction known as the 'falsus in uno, falsus in omnibus' charge, which provides: 'If you find

that any witness testified falsely about any material fact, you may disregard all of his testimony, or you may accept such parts of it as you wish to accept and exclude such parts of it as you wish to exclude'"). Therefore, I am rejecting all allegations supporting reasonable suspicion other than the positive urinalysis, which Randle admitted.

## B.  Positive Urinalysis

At this point, the issue is whether a positive urinalysis alone creates a reasonable suspicion that justifies searching a parolee's car or residence.  Courts agree that when a probationer or parolee tests positive for using illegal drugs, this supports a reasonable suspicion to search his residence.  See U.S. v. Becker, 534 F.3d 952, 956-57 (8th Cir. 2008) (finding reasonable suspicion when a probationer tested positive for illegal drug use, failed to attend drug treatment, and violated probation to visit his girlfriend); U.S. v. Eggleston, 243 Fed. Appx. 715, 718 (3d Cir. 2007) (a persuasive non-binding opinion finding reasonable suspicion when a parolee tested positive twice for cocaine, other parolees said that he was selling drugs, and the parolee was seen riding a new motorcycle although not gainfully employed, even though he also tested negative twice for cocaine); U.S. v. Trujillo, 404 F.3d 1238, 1244-45 (10th Cir. 2005) (finding reasonable suspicion when a parolee tested positive for illegal drug use, police told his parole agent that the parolee was being investigated for drug distribution, and the parolee refused a second drug test).

Furthermore, testing positive for cocaine clearly implies that a person might possess cocaine for future ingestion or distribution.  Cf. U.S. v. Wingfield, 206 Fed. Appx. 208, 210 (3d Cir. 2006) (also a persuasive non-binding opinion finding that reasonable suspicion justified

10

searching a parolee's car when the parole agent witnessed the parolee wearing a mobile-phone

clip on his belt and confirmed that possessing a mobile phone violated parole).  For these

reasons, the positive urinalysis created a reasonable suspicion justifying Cue's searches.

## III. Conclusion

The government alleged various facts supporting a reasonable suspicion, but only the

positive urinalysis result was credible.  However, I found that a positive urinalysis alone creates a

reasonable suspicion that justifies searching a parolee's car or residence.  Therefore, I will deny

the motion to suppress.

_____
ANITA B. BRODY, J.

*xc: Speedy Trial*

Copies **VIA ECF** on _____ to:

Copies **MAILED** on _07·22·2009_ to:

O:\ABB 2009\L - Z\U.S. v. Randle -- Suppression Opinion.wpd

11