IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| JERMAINE RANDLE, | : | |
| --- | --- | --- |
| Petitioner, | : | CRIMINAL ACTION |
| | : | NO. 07-667 |
| v. | : | |
| | : | CIVIL ACTION |
| UNITED STATES, | : | NO. 11-5012 |
| Respondent. | : | |

July 8, 2013                                                                                              Anita B. Brody, J.

## MEMORANDUM

On August 5, 2011, Jermaine Randle filed a habeas corpus petition under 28 U.S.C. § 2255 seeking to vacate or set aside his sentence based on Sixth Amendments claims of ineffective assistance of counsel. Because I find that Randle's counsel at the time of the Change of Plea and Sentencing hearing ("primary counsel") was ineffective when she failed to object to, move to withdraw or appeal his illegal sentence under Federal Rule of Criminal Procedure 11(c)(1)(C), I will grant his § 2255 motion to vacate his sentence and guilty plea.

### I. BACKGROUND

On October 17, 2006, Jermaine Randle's parole agent conducted a search of Randle's bedroom and discovered 46.07 grams of cocaine base packaged for the purposes of distribution. On October 24, 2007, a federal grand jury returned an indictment charging Randle with one count of possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). Randle filed a motion to suppress, which I denied.

On December 3, 2009, Randle entered a guilty plea pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). The written plea agreement stated that he would receive a sentence of 96 months imprisonment and a $100 special assessment. It made no mention of a fine or supervised

1

release period despite the fact that the statute mandates a fine and "a term of supervised release of at least [four] years." 21 U.S.C. § 841(b)(1)(B). The Government's Change of Plea Memorandum also described the plea agreement as including only the 96 months imprisonment and $100 special assessment.[1] Gov't Change of Plea Memo at 3. Although the Government identified this numerical error at the Change of Plea Hearing, it failed to identify the more glaring omission of supervised release in the written plea agreement.

Because Randle entered into a C Plea, I explained to him at the Change of Plea hearing that "[I]f I don't give you the sentence that you've agreed to, then, of course, you have a right to withdraw your plea." Transcript of Change of Plea Hearing at 11. I asked him if he understood this, and he responded affirmatively. At the time that Randle pleaded guilty, he was on parole in Pennsylvania. I explained to him that by entering a guilty plea, it would be an admission that he violated his parole. *Id.* at 12-13. When he signed the plea agreement, Randle also agreed to waive his right to appeal or collaterally attack his conviction or sentence under most circumstances.[2] I explained to him the meaning of the waiver and he responded that he understood.

On March 9, 2010, Randle was sentenced to 96 months imprisonment, five years of supervised release, a $1,000 fine and a $100 special assessment. Randle's sentence was issued

---

[1] When describing the maximum penalty under 21 U.S.C. § 841(a)(1), the Government's memorandum missed the mark yet again, stating that the maximum penalty included a three year period of supervised, when the statute calls for a minimum of four years. *Id.* at 1; 21 U.S.C. § 841(b)(1)(B).

[2] According to the waiver, Randle could appeal if the government appealed, or if (1) his sentence exceeded the statutory maximum for any count of conviction, (2) the sentencing judge erroneously departed upwards pursuant to the Sentencing Guidelines; or (3) the sentencing judge imposed an unreasonable sentence when exercising the Court's discretion pursuant to *United States v. Booker*, 543 U.S. 220 (2005). Plea Agreem't at 4.

on March 10, 2010, and the judgment became final 10 days later, on March 20, 2010. On March 12, 2010, Randle wrote to his primary counsel:

> I am writing because I would like for you to appeal my sentence. I never agreed to 5 years probation to follow the 96 months. This is clearly a breech [sic] of contract. I have tried to contact you via e-mail as well as through my mother calling you. Please let me know if you will be handling this issue. Thank you.
>
> Sincerely,
>
> Jermaine Randle

Pet. Aff. Ex. A. At a hearing on March 11, 2013 regarding Randle's § 2255 petition, Randle testified that he asked his primary counsel to appeal his sentence because at the time he thought that was the proper remedy, but that essentially, he wanted "to actually fix the sentence because I felt like I got time that I didn't agree to." Transcript of March 11, 2013 Hearing, 27:23-25, 28:1-2. He did not hear back from his primary counsel, and he asked his mother and his friend Letitia Youngblood Wood to call her. *Id.* 28:5-8. Wood stated that she reached his counsel, who said that she would be in contact with Randle. *Id.* 20:20-21. After this conversation, Wood did not hear from back from primary counsel, and could not reach her again. *Id.* 20:22-25. On April 1, 2010 Randle wrote a second letter to his primary counsel:

> This is my second attempt at contacting you about my case. Could you please respond? My time to appeal is limited. If you do not plan on representing me, please let the courts know so that I may proceed Pro Se. Thank you.
>
> Sincerely,
>
> Jermaine Randle

Pet. Aff. Ex. B. In late March 2010, Randle's mother hired a second counsel to represent him, and paid Feinberg $1,300. Pet. Aff. ¶ 10. Second counsel visited Randle at the Federal Detention Center in Philadelphia to discuss his case in April 2010, and assured Randle that he would challenge his federal sentence. *Id.* ¶ 11. In the late spring of 2010, Randle was

3

transferred to the State Correctional Institution at Huntingdon, and had trouble contacting Feinberg. *Id.* ¶¶ 12-13. In the fall of 2010, second counsel sent Randle a letter telling him that there was nothing he could do to help him. *Id.* ¶ 14. Randle's family hired a third counsel to represent him, paying him $1,500. *Id.* Wade visited Randle at SCI Huntingdon on October 12, 2010 to represent Randle at his parole revocation hearing. *Id.* ¶ 15. Third counsel assured Randle that he would challenge his sentence in federal court. *Id.* Randle never heard from him again. *Id.* ¶ 16. When he tried to call his office, he was told that third counsel no longer worked there. *Id.* Randle states that in the winter of 2010 he asked at least five different attorneys to represent him, but none responded. *Id.* ¶ 17.

By January 2011, Randle endeavored to proceed *pro se*, but was denied access to the library for three weeks due to a long waiting list. Pet. Aff. ¶¶ 18, 20. The library materials at SCI Huntingdon cater to prisoners in state custody seeking to challenge their sentences under 28 U.S.C. § 2254. As a result, Randle could not find books or forms related to § 2255 petitions. *Id.* ¶ 21. In the spring of 2011 he requested a § 2255 petition from the Federal District Court. *Id.* ¶ 22. He received the form in March or April of 2011. *Id.* He ultimately filed a *pro se* habeas petition signed and dated on July 29, 2011, approximately four months after his March 20, 2011 AEDPA deadline expired.[3]

In his *pro se* petition, Randle argued that his plea counsel was ineffective when she failed to timely object to his sentence when it included five years supervised release. He also argued that his plea counsel was ineffective when she failed to appeal his sentence upon his request, and

---

[3] The petition was signed and dated July 29, 2011, though it was not filed with this Court until August 5, 2011. Federal and Pennsylvania courts have adopted the "mailbox rule," that tolls statutes of limitations and filing deadlines on the date that prisoners give up control of court documents and deliver them to prison officials to be mailed. *Nara v. Frank*, No. 99-5, 2004 WL 825858, at *5 (W.D. Pa. Mar. 10, 2004) (citing cases).

that his petition should be equitably tolled due to attorney abandonment. He sought the right to withdraw his guilty plea or an evidentiary hearing on counsel's actions.

On June 15, 2012, I appointed new counsel for Randle. On September 10, 2012, Randle's counsel filed a memorandum of law in support of his petition. In this memorandum, Randle argues that (1) he is entitled to equitable tolling because he was abandoned by counsel and did not have access to the requisite legal materials; (2) his right to file a habeas petition was not waived because his plea counsel was ineffective in advising him on the meaning of his plea agreement, (3) his guilty plea was not knowing and voluntary because his plea counsel did not explain to him or negotiate with the government the impact of his guilty plea on his state parole, and because he did not realize his sentence would include a term of supervised release and a fine absent from the written plea agreement, and (4) that his plea counsel was ineffective because she failed to file an appeal when he asked her to.

On March 11, 2013, I held an evidentiary hearing. At the hearing, the Government stated

> [I]n all fairness, the way the plea agreement reads . . . it's a bad plea agreement, quite frankly. It read that pursuant to 11(c)(1)(C) the Government's recommendation, the agreed upon sentence was 96 months imprisonment and a $100 special assessment. There was no talk of any supervised release. There was no indication of any fine that would be imposed. And . . . the Government is going to stand by that, Judge. I don't think we can ask this Court to impose supervised release or a fine beyond that.

Transcript of March 11, 2013 Hearing, 4:2-12. Counsel for the petitioner presented the testimony of Letitia Youngblood Wood and Randle. I requested, and the parties submitted, additional briefing on Randle's argument that his counsel was ineffective because she did not negotiate for his state sentence for his parole violation to run concurrently to his federal sentence.

5

## II. DISCUSSION

Section 2255 empowers a court to "vacate, set aside, or correct" a sentence that "was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). If a party is entitled to relief under § 2255(a), "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *Id.* § 2255(b).

### A. Equitable Tolling

After a judgment becomes final, a prisoner has one year to file a petition for habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2255(f). Randle's sentence was issued on March 10, 2010, and the judgment became final 10 days later, on March 20, 2010. *See* FED. R. APP. P. 4(b)(6). Randle filed a *pro se* habeas corpus petition four and half months past the statute of limitations. He argues that he should be entitled to equitable tolling because he faced extraordinary circumstances from March 2010 until January 2011 due to attorney abandonment, and from January 2011 to March or April of 2011 due to lack of access to the necessary legal materials.

"There are no bright lines in determining whether equitable tolling is warranted in a given case." *Pabon v. Mahanoy,* 654 F.3d 385, 399 (3d Cir. 2011) *cert. denied,* 132 S. Ct. 2430 (U.S. 2012). The Third Circuit will equitably toll the running of AEDPA's habeas clock if the petitioner can establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Both elements are required in order to qualify for equitable tolling. *Sistrunk v. Rozum*, 675 F.3d 181, 190 (3d Cir. 2012). The Supreme Court has emphasized that courts should favor flexibility over adherence to mechanical rules, taking into account the particular circumstances of each

petitioner to make a case-by-case decision. *Ross v. Varano*, 712 F.3d 784, 799 (3d Cir. 2013) (discussing *Holland v. Florida*, 130 S. Ct. 2549, 2563 (2010)). Although courts should use the doctrine sparingly, "equitable tolling is appropriate where the principles of equity would make the rigid application of a limitation period unfair." *Id.* "[T]he proper inquiry is *not how unusual the circumstance* alleged to warrant tolling is among the universe of prisoners, . . . *but rather how severe an obstacle it is for the prisoner* endeavoring to comply with AEDPA's limitations period." *Pabon v. Mahanoy,* 654 F.3d at 400 (emphasis in original).

### 1. Extraordinary Circumstances

#### a. Attorney Abandonment

The Third Circuit has recognized in certain cases that an attorney's malfeasance, combined with the petitioner's reasonable diligence to pursue his rights may warrant equitable tolling of the statute of limitations. *Ross v. Varano*, 712 F.3d 784, 800 (3d Cir. 2013); *Schlueter v. Varner*, 384 F.3d 69, 76 (3d Cir. 2004). For instance, the court found equitable tolling was warranted in a Title VII case where counsel misrepresented to his client that he had already timely filed a complaint, and by the time the client discovered that he had not done so, the statute of limitations had run. *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 239 (3d Cir. 1999). The Supreme Court addressed attorney abandonment in *Holland v. Florida* when it granted equitable tolling for a prisoner whose attorney failed to file a timely petition despite the prisoner's requests, failed to inform the prisoner about crucial state court decisions, and failed to respond to the prisoner's letters or remove himself from the case so that the prisoner could proceed *pro se*. *Holland v. Florida*, 130 S. Ct. 2549, 2563 (2010). The Court deemed the attorney's conduct "extraordinary," compared to an attorney missing a filing deadline, which is "garden variety." *Id.* at 2564. In a concurring opinion, Justice Alito distinguished attorney error

7

from attorney abandonment. *Id.* at 2567-68. Such abandonment "would suffice to establish extraordinary circumstances beyond his control . . . a litigant cannot be held constructively responsible for the conduct of an attorney who is not operating as his agent in any meaningful sense of the word." *Id.* at 2568. In a subsequent case, the Supreme Court recognized that attorney abandonment warranted waiver of procedural default for a death row inmate who missed his window to appeal. *Maples v. Thomas*, 132 S. Ct. 912 (2012).

Like *Holland,* the Third Circuit similarly distinguishes between attorney error and attorney abandonment, or an attorney who actively misleads his or her client. *See Nara v. Frank*, 264 F.3d 310 (3d Cir. 2001). In *Nara*, the petitioner was serving a life sentence and argued that he should be entitled to equitable tolling because of extraordinary circumstances: his mental health problems affected his ability to file a timely habeas petition, and his attorney effectively abandoned him and prevented him from filing a habeas petition on time. *Id.* at 320. The Third Circuit remanded the case back to the District Court to determine if equitable tolling should apply. On remand, the District Court found that Nara was entitled to equitable tolling because his attorney actively misled him by telling him that she would file an "appeal," he could not reach her by phone, and he tried to get his attorney to withdraw so that he could proceed *pro se*. *Nara v. Frank*, No. 99-5, 2004 WL 825858, at *7-12 (E.D. Pa. Mar. 10, 2004). Coupled with Nara's diligence, the District Court found that extraordinary circumstances existed and equitable tolling was warranted. *Id.* at *12. The Third Circuit affirmed the lower court's decision. *Nara v. Frank*, 488 F.3d 187 (3d Cir. 2007). Similarly, in *Ross v. Varano*, the Third Circuit equitably tolled the AEDPA deadline for a four year period from 2004 to 2008 during which the petitioner's lawyer lied to him that he filed an appeal, failed to take his phone calls, and withdrew the prisoner's appeal but failed to file a collateral post-conviction petition in its stead

8

despite his representations to the contrary. *Ross v. Varano*, 712 F.3d at 801. Though he did not have physical evidence, the petitioner stated that throughout the four year period he regularly and repeatedly wrote letters and called his attorney in an attempt to pursue his appeal. *Id.* at 802.

Randle was at the mercy of more than mere attorney error. He was abandoned not just by one, but three attorneys who took his money and lead him to believe that they would challenge his sentence in federal court. Randle, his friend, and his mother made repeated requests via e-mails, letters and phone calls to his primary counsel requesting that she appeal his sentence. Letitia Youngblood Wood made contact with counsel, who assured her that she would follow up with Randle, though she never did. Randle specifically requested that his counsel tell him if she intended to represent him, because otherwise, he wished to proceed pro se. She never responded, though she never withdrew her representation, and therefore continued to receive notices related to the case sent by the court. Next, Randle was affirmatively led to believe that second counsel would challenge his federal sentence, only to be told months later that Feinberg could not help him. Finally, third counsel promised Randle that he would challenge his federal sentence, only to disappear and never be heard from again. Randle reached out to at least five other attorneys after this, asking them to represent him, but none responded. The active misrepresentations the attorneys made, coupled by their utter abandonment constitute an extraordinary circumstance that prevented Randle from pursuing his habeas petition from March 2010 to January 2011.

### b. Access to Library and Materials

From January 2011 until April 2011, Randle claims he was denied library access, and then lacked the necessary forms to file a petition. Limited access to prison law libraries alone does not rise to the level of extraordinary circumstances. *See Young v. Piazza*, No. 06-1993, 2006 WL 3762004, *4 (E.D. Pa. Dec. 19, 2006) (finding no equitable tolling for petitioner who

9

conceded he had at least limited access to the library during the one-year period); *Perry v. Vaughn,* No. 02-839, 2003 WL 22391236, at *4 (E.D. Pa. Oct. 17, 2003) (finding that a lockdown and limited library access alone did not qualify for equitable tolling). However, a complete lack of access to the library can rise to the level of extraordinary circumstances if the petitioner can demonstrate that those circumstances "actually impeded his ability to file a timely petition." *Perry v. Vaughn*, 2003 WL 22391236, at *4. Lack of access to the appropriate legal forms can also rise to the level of an extraordinary circumstance. *Pabon v. Mahanoy*, 654 F.3d 385, 401 (3d Cir. 2011) (finding that petitioners "inability to read understand English, combined with denial of access to translation or legal assistance, can constitute extraordinary circumstances that trigger equitable tolling"); *Butler v. Walsh*, 846 F. Supp. 2d 324, 330 (E.D. Pa. 2012) (finding that prisoner's lack of access to habeas forms, and prison officials actively preventing delivery of the forms to the petitioner constituted an extraordinary circumstance); *George v. Lamas*, No. 11-1462, 2012 WL 4506077, at *5 (M.D. Pa. Oct. 2, 2012) (finding that petitioner was entitled to equitable tolling for filing his petition 10 days late when he received the necessary forms a month after asking the Clerk's office for them, and mailed the petition five days after receiving the forms). *But see Rios v. Tennis*, No. 05-6640, 2008 WL 2952352 (E.D. Pa. July 29, 2008) (finding that "[i]t was not necessary for Petitioner to await proper habeas forms in order to file his federal habeas petition.").

Randle was denied access to the library for three weeks while he was on the waiting list. He did not even have limited access during this period. Once he did have access to the library, he could not find books or forms related to § 2255 petitions. This is unsurprising considering that Randle was at a state correctional facility, where prisoners would be much more likely to file § 2254 petitions. Randle requested § 2255 forms from the district court and received them in

10

March or April of 2011. His complete lack of access to relevant § 2255 materials during this period of time constitute an extraordinary circumstance that warrants equitable tolling for this period of time.

### 2. Reasonable Diligence

The U.S. Supreme Court has ruled that "reasonable diligence" is required for equitable tolling purposes, not "maximum feasible diligence." *Holland,* 130 S. Ct. at 2564. Courts use a subjective test to determine whether a petitioner has exercised reasonable diligence in light of the particular circumstance of the case. *Ross v. Varano,* 712 F.3d at 799. Even a petitioner proceeding pro se must meet the "reasonable diligence" inquiry despite his lack of legal knowledge or training. *Id.* at 799-800. In *Ross*, the court found that the petitioner demonstrated perseverance and diligence when he tried to contact his attorney by letter and phone over a four year period about his appeal, despite the fact that he had no records of the correspondence. *Id.* at 801-02. The court rejected the Commonwealth's argument that the petitioner lacked diligence, noting that it was unreasonable to "expect Herculean efforts on the part of a lay person who is a convicted and incarcerated prisoner of limited cognitive abilities, and whose every attempt to pursue his appeal has been thwarted." *Id.* at 802.

Based on the circumstances presented in this case, Randle exhibited reasonable diligence. Immediately upon being sentenced he recognized that he did not receive the sentence he specifically agreed to in his written plea agreement and immediately attempted to contact his attorney, asking her to take action. When Randle could not reach her, he enlisted his friend and mother to try to contact her. He then paid two other attorneys, each of whom promised to help him and then abandoned him. Still persistent, he contacted at least five attorneys to take his case, to no avail. Once he realized he was on his own, he tried to gain access to the library, and

materials necessary to file his petition. When he finally received the correct form by April 2011, he submitted a habeas petition dated July 29, 2011, complete with a memorandum in support of his petition with exhibits, received by the court on August 5, 2011. His petition was well-reasoned with citations to applicable case law. As an incarcerated prisoner with limited resources at his disposal and a modest educational background,[4] I find that Randle demonstrated reasonable diligence in his attempts to retain counsel, and ultimately, represent himself in a credible case when treated so shabbily by the AUSA and his own attorneys. Therefore I will grant equitable tolling of the AEDPA statute of limitations. Randle's petition is properly before this court.

**B. Breach of the C Plea**

In Randle's pro se habeas memorandum, he argues that his counsel was ineffective when she failed to object to his sentence, file a motion to have his guilty plea withdrawn, or appeal when I gave him an illegal sentence. In his subsequent counseled memorandum, he argues (1) that he did not waive his right to file a habeas petition despite signing a waiver in his plea agreement, (2) that he did not knowingly and voluntarily enter his guilty plea because his attorney and the court failed to explain to him that he would receive a term of supervised release and (3) that his counsel was ineffective when she failed to inform him that by pleading guilty he could face a consecutive state sentence. Because I will grant Randle's claim for ineffective assistance of counsel concerning the withdrawal of his guilty plea and failure to appeal his sentence, I need not reach the merits of his other claims.

---

[4] Randle's Presentence Investigation Report states that he was expelled from West Philadelphia Catholic High School in March of 1996 for poor conduct. He was transferred to John Bartram Human Services High School, but withdrew in May of 1998, in eleventh grade. He later participated in a residential program at The Glen Mills School and earned his GED in 1998. At SCI Huntingdon he completed nine education courses in the areas of science and business. Presentence Investigation Report at ¶¶ 63-66.

To prevail on an ineffective assistance of counsel claim, a petitioner must meet the *Strickland* standard; specifically, a petitioner must show both deficient performance by counsel and prejudice. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky,* 130 S. Ct. 1473, 1485 (2010). A party raising an ineffective assistance of counsel claim in a § 2255 Petition holds the burden of proving his or her claims. *United States v. Otero,* 502 F.3d 331, 333 (3d Cir.2007). Randle must "sustain[ ] his contentions by a preponderance of the evidence." *Wright v. United States,* 624 F.2d 557, 558 (5th Cir.1980).

To demonstrate that counsel's performance was deficient, Randle must prove that counsel's performance "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694. This test applies to claims that counsel was constitutionally ineffective for failing to file a notice of appeal. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). "[A] lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." *Id.* This is because filing an appeal is a ministerial task, and a lawyer's failure to do so, at the request of his or her client, reflects inattention to the defendant's wishes rather than a strategic decision. *Id.*

Randle specifically asked his counsel to appeal his sentence through e-mails, letters, and calls from his friend and mother. He could not have been clearer when he wrote to his plea counsel, "I am writing because I would like for you to appeal my sentence. I never agreed to 5 years probation to follow the 96 months. This is clearly a breech [sic] of contract." Pet. Aff. Ex. A. Even if his counsel somehow failed to receive this letter in the mail, Letitia Youngblood

13

Wood testified that she called and spoke with her, and she told Wood that she would contact Randle. Plea counsel's failure to appeal therefore constitutes constitutionally deficient performance. This conduct "mandates a presumption of prejudice because the adversary process itself has been rendered presumptively unreliable." *Roe,* 528 U.S. at 471.

Randle's counsel was also deficient in her failure to object to the sentence or file a motion to withdraw Randle's plea on the basis that the sentence breached the plea agreement. Randle entered into a guilty plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). In a C Pleas, the government agrees that a certain sentencing range applies, and the recommendation binds the court once it accepts the plea agreement.[5] FED. R. CRIM. P. 11(c)(1)(C)). If the District Court does not accept the sentencing agreement, the defendant must be allowed to withdraw his or her guilty plea. FED. R. CRIM. P. 11(c)(5)(B). Thus, once a plea agreement with a sentencing stipulation is agreed to by the parties and accepted by the Court, it must be enforced at sentencing. *U.S. v. Bernard,* 373 F.3d 339, 344 (3d Cir. 2004) (finding that a sentencing court may accept a plea agreement where the parties stipulate to sentences, or sentencing factors that would otherwise contravene the sentencing guidelines because Rule 11(c) takes precedence). I specifically advised Randle of this remedy when I took his guilty plea.

Plea agreements are contractual, and therefore analyzed under contract law standards. *U.S. v. Gilchrist*, 130 F.3d 1131, 1134 (3d Cir. 1997) (citing *United States v. Moscahlaidis*, 868 F.2d 1357, 1361 (3d Cir. 1989)). Therefore, the imposition of an additional condition on a C Plea breaches the agreement. In *Gilchrist*, as in this case, the defendant entered into a C Plea

---

[5] Federal Rule of Criminal Procedure 11(c)(1)(C) dictates that, ". . . If the defendant pleads guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement)."

that did not include a period of supervised release—just a sentence of nine months of imprisonment, one month of home confinement, a fine, and an assessment. *Id.* at 1132. The court sentenced Gilchrist to nine months of imprisonment, a fine, an assessment, and a one year period of supervised release, including one month of home confinement. *Id.* The Third Circuit found that even if home confinement is usually accompanied by a period of supervised release, the defendant did not reasonably expect to receive the additional year of supervised release. *Id.* at 1134. Therefore, the court remanded the case back to the district court to determine the appropriate remedy—either specific performance of the plea agreement, or providing the defendant the opportunity to withdraw his plea. *Id.* at 1136. Similarly, the Eleventh Circuit vacated a district court's sentence when it imposed five years of supervised release on a prisoner whose C Plea agreement made no mention of supervised release. *U.S. v. Vallejo*, 463 Fed. App'x. 849 (11th Cir. 2012).

    I imposed an illegal sentence on Randle that clearly departed from the terms of the plea agreement that he entered pursuant to Rule 11(c)(1)(C). The imposition of an additional condition of supervised release and fine breached the plea agreement, as Randle argued in his pro se petition. Randle recognized the error immediately, and even the Government has since conceded that Randle's sentence breached his plea agreement. Randle's counsel appears not to have noticed the error, evident from her failure to object to my sentence or challenge it in any way.[6] Even after Randle wrote to initial counsel alerting her to the error, she failed to respond,

---

[6] Randle's counsel did not object to the addition of supervised release at sentencing, calling into question not only her own familiarity with her client's plea agreement, but also whether she adequately explained the plea agreement to Randle so that he could enter into the plea agreement knowingly and voluntarily. The Fourteen Amendment's Due Process Clause permits a guilty plea only if it is knowing and voluntary. *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). The confusion surrounding the error-ridden plea agreement casts doubt as to whether Randle entered his guilty plea knowingly and voluntarily. *See Houmis v. United States*, 558 F.2d 182, 186 (3d

15

and allowed his window of appeal to pass. This behavior "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688. Furthermore, the ineffectiveness prejudiced Randle, because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. While counsel cannot be deemed ineffective for failing to raise a meritless claim, here the sentence clearly breached the written plea agreement. *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000). The only thing that stood in the way of Randle's attentiveness to the error and diligence in his attempts to challenge his incorrect sentence was his attorney's neglect. Surely, had she realized the error or learned of it by responding to Randle's communications, she would have complied with her client's request to appeal or move to withdraw the guilty plea on the basis of the breach. Upon recognizing my error, I would have given Randle the opportunity to withdraw his guilty plea. Therefore, Randle's counsel's ineffectiveness prejudiced him, and he is entitled to have the opportunity to withdraw his guilty plea.

### C. Waiver

As a final matter, the Government argues that Randle could not bring a habeas petition because he signed a waiver that limited his appellate rights, and his claims fall under the waiver. Criminal defendants may waive their right to appeal or collaterally attack their sentences through habeas petitions. *U.S. v. Mabry*, 536 F.2d 231, 236 (3d Cir. 2008). The waiver was part of the written plea agreement, and by signing the plea agreement, Randle agreed to the waiver. Because Randle's guilty plea was entered pursuant to Rule 11(c)(1)(C), however, I instructed him wholly outside of the plea agreement that he had a right to withdraw his plea if I did not give

---

Cir. 1977) (petitioner was given the opportunity to withdraw his guilty plea where the court found sufficient confusion in the record as to petitioner's understanding of the terms of the plea).

16

him the sentence he agreed to.  Because he challenges his sentence on this basis, the waiver does not apply.

### III. CONCLUSION

For the foregoing reasons, I will grant Randle's § 2255 motion to vacate his conviction and guilty plea, and reinstate his right to trial by jury.

_____/s/ Anita B. Brody_____  
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:  Copies **MAILED** on _____ to: